Glencore Singapore Pte Ltd 241303 Good afternoon. Good afternoon, Your Honor. May it please the court. My name is Thomas Tisdale of Tisdale and Nask. We're counsel for the plaintiff appellants, the owners and managers of the vessel Seraphos. All parties agree that if the plaintiff's allegations make plausible the idea that Glencore acted in a way which was recklessly indifferent, or that its misconduct was wrongful or intentional, that invalidates the exoneration and limitation provisions in their contract. Interpreting the allegations in the plaintiff's second amended complaint as true and drawing all the inferences in plaintiff's favor. So you're going right to the gross negligence issue. Actually, I'm going to go to the breach of contract issue, Your Honor, but based, but invalidating the provisions on the basis of gross negligence and intentional misconduct. Yes, sir. The, uh, we believe that the 30 page 129 paragraph second amended complaint more than adequately alleges misconduct, which in the court's words, smacks of intentional wrongdoing. Before the vessel Seraphos was fully stemmed on March the 12th, three different laboratories in Singapore had issued advisories to its client, to their clients, advising that organic chlorides were present in bunkers being supplied there, 10 different vessel owners had complained to Glencore about experiencing operational issues, trying to consume the bunkers that they just purchased from Glencore. These are operational issues, which are telltale to contamination, specifically organic chloride contamination, but more importantly, four of those ship owners specifically identified that there were organic chlorides present in the bunkers, which they had received. Moreover, Glencore admitted in answers to interrogatories that... Wait, wait, I'm sorry, I'm not sure that that's squared with my reading of your complaint, and so it seems to me that, uh, the complaint talks about problems with shipping, but the organic chlorides, uh, in many cases, uh, are from reports that post-date the stem, the stem, right? Your Honor, the stem... I'm just asking you to pinpoint which portions of the complaint you're referring to when you say that there were multiple complaints of, uh, organic chlorides. Yeah. First, we need to clarify that the stem began on March the 11th and concluded on March the 12th. Okay. By March the 12th, if you look at paragraphs 29 through 43 of the second supplemental second amended complaint, we outline different complaints, which Glencore had received. You'll see that they're redacted, but they, uh, uh, starting on, in fact, 28. Um... That just talks about, uh, operational difficulties, right? Well, there are... That's not about organic chlorides. Correct. There are... Okay. So I just want to make sure I'm not missing something. So where are the ones that start talking about organic chlorides? Sorry, let me get to... Well, there's the MPA report, and then... Yes. Well, then that post-dates the stem. Right? The stem is March the 12th. Right. And the MPA report is what? Oh, the MPA report is much later. Oh, yes. Okay. But however, Your Honor, if I can, in paragraph, um, in paragraph 29, we talk about the fact that in an internal memo in Glencore, another vessel identified in its correspondence that, which reported serious engine performance issues with the presence of 1,2-dichloro presence. 1,2-dichloro is organic chloride. What's the date on that? That's referring to conversations that occurred the week prior, which is March 6th through March 12th. So this is an email dated March 14, referring to complaints that were received March, between March 6th and 12th. On the 3rd of March, we received a final notification. Is that, is that what you're referring to? No, I'm referring, that, that's, that's the internal email. If you look at the last line on that paragraph, it says another vessel identified in the correspondence reported serious engine performance issues and the presence of 1,2-dichloro presence.  It's a, uh, mis, Scrivener's mistake with presence twice, but 2, 1,2-dichloro is organic chloride. Okay. Moreover, Judge, in paragraph 36, it shows that on March 11th, there was a task- Wait, wait, wait, but that's outside of the quotes, right? What's outside of the quotes? Well, I mean- Oh, yes. The measure of 29 talks in quotes from, uh, an email that refers to March 3rd. And then outside of the quotes, the, the paragraphs, the complaint says another vessel identified, uh, had this presence, but it doesn't say when the presence was identified and when, whether, and when that was made known to, uh, Glencore. Well, that's the email talks about, it's a long email, but the long, the email is dated March 14th, and it talks about the week prior being 6 through 12. When there's a communication about experiencing issues burning the fuel supply to them. Correct. But the representation about the 1,2-dichloro presence, that doesn't appear to, it's not clear to me from the face of the complaint that that was communicated prior to March 11th. I think what it's saying, Your Honor, is the week before March 12th, March 14th- There's a complaint about problems with fuel, burning fuel, but the dichloro presence is not in the quoted section that's in this paragraph. No, sir. But it's in the email. Okay. I did not, I did not quote the entire email. But the email is March 14th. But it's referring to complaints received the week prior. About dichloro presence? I think that's not a fair, all right. Well, what else do you have? March, on paragraph 36, on March 11th, 2022. So that's the day that the stemming is already taking place. It's already, it starts late that evening. Okay. Okay. They say that the VPS report extended, showed two chlorohydrocarbon compounds in it. Paragraph 38 refers to a GCMS test they received on March the 12th, the day it's completed, my ship hasn't left yet, showing presence of 1,2-dichloroethene and tetrachloroethylene. Paragraph 42 says on March the 12th- But that's all like mid-stemming is what you're really relying on now, it seems to me. Some of these are, some of these are mid-stem, Your Honor. But also the negligence here, first of all, well, and let me take you one more step, in answers to interrogatories, this is specifically admitted to the fact that as of March 8th, they were aware that their bunkers contained organic chlorides. So I look for that, I mean, is that in the record, this interrogatory, or we just have the characterization in the complaint? No, sir, it's in the record. It's paragraph 50. No, no, no. I mean, I, I mean, is the interrogatory- The interrogatory is, I don't know that the interrogatory itself is in the record, Judge, but the allegation is in paragraph 50. The description of the interrogatory response. Correct. Right. Okay. So as of March the 12th, they had four complaints. As of March the 8th, they admit to the fact that they knew that there were organic chlorides present in the bunkers. They allowed this vessel, so when they contracted with my client on March the 10th, they specifically agreed that this would, would conform with international regulations, which specifically exclude organic chlorides as being permitted in- So, so I, there's something that I don't understand, and it actually goes back, and maybe it was reprised in the proposed amendment complaint, but at paragraph 18 of the initial complaint, there's an allegation that the drip sample that they took of the fuel actually satisfied the ISO. It says the simple ISO specification requirements that are set forth in the contract. What does that, what does that mean? If, if so, and you're telling me that it doesn't, it doesn't satisfy the ISO. So- But you, you're alleging that it does here. The, there are two different kinds, two different tests which were performed. Okay, there are ISO specifications for the product, which are just tell you the viscosity, the pour point, the temp, it's, you know, specific specifications. When it comes to these additional issues, such as contamination by organic chlorides, sometimes they don't change those specifications. So in the initial, in the, we had two tests performed, one being of the product itself, the drip sample, which showed that it conformed with the written specifications, the pour point, viscosity, sediment, et cetera. We also had a test done of what they call the headspace, the vapors. And that headspace test is what disclosed to us the existence of these organic chlorides, and that was March 20th, eight days after the stem, by which point we had already consumed all of the uncontaminated fuel we had on board from a prior stem elsewhere. But the allegations in the complaint more than sufficiently established that Glencore knew that this product contained organic chlorides, yet they never disclosed it to us. They loaded on board our ship anyway, and then they allowed our vessel to sail, which then caused it to consume the only uncontaminated fuel it had on board, sailing to areas such as the Cape of Good Hope and the Skeleton Coast, putting the crew at greater risk because it no longer had good fuel on board. So it created a problem which now increased the cost of our efforts to mitigate the damages which would have been caused had we burned the fuel with organic chlorides. Organic chlorides are very deleterious to vessels' engines. No, I don't think there's any dispute about that. I think the issue is really, obviously, whether they engage in recklessly indifferent conduct. Although, I mean, I'm going to ask your adversary about the interrogatory, but one of the things that I was surprised at, because in paragraph 26, you say that of which? Of the amended complaint. Thank you. You say that the Viscois lab alerted the industry on March 1st that it had already identified three ships whose Glencore stemmed bunkers they analyzed and found contaminated with organic chlorides, right? Yes, sir. We have that. We actually have that in the record at JA 170, that notice from March 1st. It doesn't say anything about Glencore at all. It doesn't mention Glencore anywhere. Am I right about that? I think the notice that's in the record does not specifically identify Glencore. Well, isn't that a mischaracterization of the notice? The industry was alerted about Glencore-steamed bunkers? All this says is that there were two different suppliers, or three supplies, out of Singapore that had high levels of organic chlorides. It didn't say anything about Glencore. You may be correct, Your Honor. I don't remember the specifics of that Viscois lab analysis. There were three different companies which sent out advisories before March the 12th. Glencore was identified in at least one of them. So, really, for me, the question would be with respect to this Viscois report, what are we to make of the fact that if it suggested that there was some contamination, and if Seraphos itself understood that, what are we to make of that fact? Yeah. There's no allegation in any of the pleadings which would indicate that Seraphos was aware of it. The advisories were sent to the Viscois lab's customers, as did other laboratories send out announcements to their customers. We were unaware of this problem before March the 10th. When we entered into the contract, we were not aware of it until March the 20th, when we ultimately got our contract. Now, going back to the issue of the conduct of the contract, Your Honor, I believe this contract goes further than just the stem, because there are quantity warranties which go for 30 days afterwards, for instance. And I also believe that Glencore had an independent duty to warn once they became aware of the existence of organic chlorides in this product. But they didn't do that. That's true. Contractual duty. Yes, sir. And what's your basis for saying that? Well, I think the restatement provides it. And I think that we have, well, first of all, the contract provides that quality issues can be raised 30 days after the stem takes place. So I don't think this is just an issue of you fill the ship and off you go and your duties are concluded. Okay. They know we're not going to get the response. So if during the course of that 7 to 10 days, they knew or should have told us. Part of MARPOL and part of the Singapore law is that the bunker supplier have in place management of change procedures in place such that when they become aware of an issue, they investigate it so that they know the nature, cause, and extent of the problem and they take action. That's exactly why the MPA sanctioned them for knowingly selling contaminated bunker fuel. And that's what they did to the Seraphos. And they allowed us to continue on increasing the cost to mitigate this damage, which would have occurred had we consumed that bunker fuel. Let me ask you to go back to the negligence issue. So I'm looking at J385 paragraph 49 and it's subparagraph C, Glencore proceeded to  So by around 12 March, 2022, so a day after the stem, Glencore had received complaints from several of its customers. This is the MPA. So this is really what it's incorporated here. Glencore had received complaints and then Glencore proceeded to arrange for an independent laboratory to test, retain samples of the fuel for organic chloride. So that seems inconsistent with your gross negligence theory. No? I don't believe so, Judge. I think the gross negligence occurred. The intentional misconduct occurred when they allowed this to continue on until such time as they finally did take some form of action. But admitting that you have a problem on March the 8th, being aware of it as early as possibly March the 1st, based upon some of these analyses, reports. Your paragraph 50 says they admitted to, that they had learned the testing of a sample that it had supplied in Singapore between January and March. So very vague, purported to detect the presence of organic chlorides. I mean, so it's pretty general. So anytime you have a sample that tests positive for organic chlorides, you've got to shut down all your sales at that point. Is that your view? If a company like Glencore is aware that a sample of bunkers has yielded the presence of organic chlorides, they've got to just stop fueling? No, they have to immediately take action to investigate it. They have to put in their management of change procedures and investigate what the nature, cause, and extent of that issue is. Okay? They didn't do anything until March the 12th, in which point they continued, but they didn't do anything throughout that period of time. They contracted with my client two days after they became aware of this, and they stemmed them for it two days after that. Well, I mean, the second sentence of this paragraph 50 says, thus, defendant admits that before it stemmed the MV Seraphos and issued the BDN, it knew that the bunkers it intended to stem were likely contaminated with organic chlorides. That's really your inference, right? That's not what they said in their interrogatory. They said in their interrogatory, we knew that the bunkers we intended to stem were likely contaminated with organic chlorides? No, sir. No. Okay. So we've kept you well past your time. We'll hear from your friend on the other side, and then you reserve some time for rebuttal. Mr. Cabanas, no questions? Oh, thank you. No questions. Your Honors, good afternoon. I'm Peter Bentke. I'm here on behalf of the Lincorps. I'd like to start because there was a lot of focus on the contractual requirement for challenging the contractual limitations, and I want to focus in particular on the sole remedy clause. Actually, in the oral argument, there was a lot of focus on the post-negligence issue. I will get there. Okay. Very important as well. This is your argument. But I just want to correct something stated by Mr. Tisdale. He opened with stating that there was no dispute that if there's recklessness or gross negligence proven, that that would be sufficient to challenge the sole remedy clause in the contract. I do disagree with that. And more importantly, the Court of Appeals disagrees with that. In the 60 put-back litigation discussed extensively in our briefs, the Court makes very clear that when dealing with an exclusive remedy clause, which is what we have in our contract, that allegations of gross negligence, even if established, will not suffice to invalidate that clause. And in our case, our exclusive remedy clause provided that in the case of an off- specification supply of fuel oil, Lincorps' only obligation was to remove and replace that oil, which it did do so in Singapore. And so for plaintiffs to successfully let me ask you a question. If there were an allegation, actually forget the allegation, if there were direct proof that it intentionally contaminated the fuel, is it your suggestion or your argument that the sole remedy provision 7D of the contract would override that and not permit them to sue? No, Judge. That's a different case. That is not our case. Okay. So what is the difference between gross negligence and intentional misconduct that would distinguish 7D from one and allow the other? Yes, Judge. So the Court of Appeals explains the distinction in the Jarosch-Kauser case, which explains the public policy behind the gross negligence and intentional or willful misconduct exceptions to enforcing these types of clauses. The distinction is that, well, in all cases, there has to be proof of intentional wrongdoing. But with gross negligence, you can prove that implicitly. And that's why recklessness is allowed. If you can establish that there was recklessness, that could allow the Court to find that there's gross negligence and invalidate a clause. Right. But I'm not sure I agree with your characterization of the law. So you're saying that if there's evidence that there was gross negligence such that it betokens a reckless indifference to the rights of others, this contractual provision still doesn't apply. They're stuck with a $300,000 limit. That's your view? Not just the limit, Your Honor. Although I do agree with that with respect to the limit. But, yes, also with this whole remedy clause. So even if they engage in gross negligence and it reflects a reckless indifference to the rights of others, that doesn't matter. That's your view? That is exactly what the Court of Appeals instructs, Your Honor. This is Kalish and Charco, however you pronounce it. No, no. Which one are you referring to? Two things. In the 60 put-back litigation case, that's 2020, the Court of Appeals, and this was, frankly, news to a lot of us in the bar, but the Court of Appeals was very explicit in its direct holding that as long as a contract between sophisticated commercial parties provides for a sole remedy and it's not a meaningless or nominal remedy, which is not the case here, then gross negligence is insufficient to challenge the enforceability of that clause. But this is a clause that carves out an exception for the limit, right? I'm not sure if I understand the question. This contract recognizes that there would be an exception, right? There's no carve-out in this contract. Well, the contract has multiple clauses that relate to the allocation of risk. There's a bar in consequential damages, for example, which I'm not talking about right now. There is a $300,000 overarching liability cap, and there's also an exclusive remedy clause. So what you're arguing, what I think you're saying, is that this is not, 7D is not an exculpatory or a nominal damages clause? That is correct. And as a result, even gross negligence is captured by the cap that's contained in 7D, under 60 foot. Is that the argument? The argument, let me take a step back. Because there is a sole remedy clause in this contract, which was fulfilled by Glencore, plaintiffs are not entitled to further compensatory damages. And they can only challenge that clause if they establish an explicit intent to injure. That's the standard that they have to meet. That's what willful misconduct means in this context. That's from the Metropolitan Life case, life insurance case, the New York Court of Appeals. There has to be an intent to injure. And all of the cases that they cite for that standard recognize that that is the requirement. And that's the reason why they're not able to challenge the validity of that clause. They had earlier proceeded on a fraud theory. But that's not what Kalish says, right? Kalish Charco doesn't say that. It basically says that intentional wrongdoing can be established by fraudulent, malicious, sinister intention, acting in bad faith, or such gross negligent conduct that it would be token of reckless indifference to the rights of others. And you're saying that that's no longer good law. So what the Court is articulating are the two levels of the public policy. So there's gross negligence, in which, from that passage that Your Honor was just quoting, the Court states that this intentional wrongdoing can be established implicitly, such as through recklessness. Or there is a higher standard, an even more difficult standard to meet, which is that the wrongdoing, the wrong conduct, has to be intentional, and it has to be with the intent to injure. And that's actually footnote four of the Kalish Charco case that Your Honor was just quoting. It is also reiterated in the Metropolitan Life Insurance case, Court of Appeals, 1994. And I'll just quote it for Your Honor. It's at page 438. Quote, The term willful acts means wrongful conduct in which defendant willfully intends to inflict harm on plaintiff, at least in part through the means of breaching the contract. There's no intent to harm him. Are you conceding that your company knew about these problems by March 8th? No, Judge. I think this may be a good time to pivot to the substance of the gross negligence allegations, although I'd like to point out, before we talk about the conduct itself, that because they cannot challenge the enforcement of the contract based on allegations of gross negligence, for any of this discussion about what Glencore knew or what Glencore did to have any relevance, they have to establish that there was an independent tort duty at issue here. And that's cited or discussed extensively in the briefs. There's not that much discussion with my friends here. But this is a classic case for application of the economic loss rule, meaning the claims that are asserted are fully duplicative of the contract claims. And the damages are economic, and the damages are contemplated by the contract. And under all of the authorities that are cited in the briefs, so the Sommer case from the Court of Appeals, the New York dormitory case, the New York University case, they all instruct that when you have a case, particularly involving a defective product that causes only economic losses, there is no tort duty implicated. And therefore, there is no need to get to the second stage of a gross negligence analysis, which is to determine whether there was egregious misconduct. And your view is that that applies to gross negligence as well as the strict liability and negligence? Yes, Your Honor. And, in fact, in the Sommer case itself, which is the main case that they rely upon, what the Court of Appeals tells us is that in a case involving a defective product where there's no physical damage, no personal injury, no abrupt cataclysmic event, and the only harm that is claimed are the costs of replacing the product, which is exactly what this case is, there is no tort claim. And that's fully consistent with East River, the economic loss rule, the poker lease incursion. So that's your gross negligence argument. And the contract argument you've already told us you think that in rate, you know, the putback litigation gets you out of any trouble under the contract. But if we don't agree with you on that, and it does matter that you guys just decided, what the hell, we're going to just sell contaminated fuel to anybody because the worst that can happen is we'll get capped at $300,000 in damages, I want to see what your response is to paragraph 50 of the amended complaint. Yes, Your Honor. It says that you guys admitted in an interrogatory that you knew that bunkers supplied to a vessel, that you supplied to a vessel in Singapore between January 1st and March 8th was found to have a detectable presence of organic fluoride. Your Honor, I think it's a good question, and I think it's important to go through the chronology of what happened here. So first, Glencore purchases fuel from a third party that contains the organic chlorides. There's no allegation that Glencore would do that. Glencore then tests the fuel for compliance with the ISO 8217 standard. That's a JA212. Prior to delivering the bunkers to customers, Glencore conducted GCMS tests. Are you going outside of the pleadings at this point, or are you just sticking with it? These are all facts that are in the record. I was actually just quoting from a document. Just answer me on paragraph 50. Yes, Judge. Okay, sorry. Okay, so do you guys know, did you admit in your interrogatory response that before you stemmed the seraphos, you knew that the bunkers you intended to stem were likely contaminated with organic chlorides? No, Judge. No. We did not agree with that. Let me stop there for a second. Sure, Judge. So this is a reference to an interrogatory, which I gather is then incorporated by reference into the amended complaint. Is that part of the record someplace, this interrogatory response? It has not been submitted as part of the record. Is it part of the record below in the district court? The only aspect, it is not, Judge, the direct answer to your question. The only aspects of that interrogatory that are in the record are the fact that Glencore received notification from one vessel out of the many supplied during that period that purportedly showed the presence of organic chlorides. That same interrogatory response, we put this in our letter briefing in front of the district court, also states that Glencore performed GCMS testing on the fuel before delivery to customers. That's testing for foreign chemicals. Plaintiffs have those test results. There's no allegation that those test results indicated the presence of organic chlorides. Glencore also, as I think Your Honor pointed out earlier, had received various reports from several customers to that stage, again out of the many supplied, showing different problems, excess water, excess viscosity, total sediment potential. Different bits of data are coming into Glencore. And what did Glencore do? They engaged an independent third-party laboratory to perform more sophisticated tests on the samples. After the fact. After they received. March 12th. After they received these reports. I think the tests were probably submitted on March 12th with the results reported on March 21. So 10 days after the delivery to plaintiffs was completed. And, by the way, one day after they had their own test results in hand that showed the presence of organic chlorides, and then they continued to consume the fuel after they had those test results. So the question here is not, what did Glencore know in terms of the customer reports? I mean, that's important, but it's not dispositive. The main question here is, what did Glencore do when it received those reports, and does that show the lack of a scintilla of care or the lack of scant care, or is it an extreme departure? Well, if you stemmed the serifose on March 11th and 12th, knowing that the bunkers you intended to use were likely contaminated with organic chlorides, that would suggest that you had a degree of knowledge that one might consider to be gross negligence, no? Your Honor, I don't believe that that degree of knowledge constitutes gross negligence. Gross negligence in this context needs to be a compelling demonstration of … I'm telling you, Tylenol, I think it's likely that it's got arsenic in it, but, you know, that's not gross negligence. Your Honor, fortunately, we're not dealing with that industry. I think there are different regulations and concerns in that perspective. But I think you get the point of the question, so answer that question. I don't represent the Tylenol industry. But, Your Honor, I think what I would want to know is what did the company do when it received, say, one report of something wrong with Tylenol from one customer out of everything that was sold? What was it required to do by industry standards, for example, recall for testing, put out a customer alert? But all of this sounds like it's your defense, so maybe this will be your answer. But this is an amended complaint that has an allegation, which is presumed to be true, that you guys admitted that you knew that what you were selling to them was likely contaminated. You're saying that assuming that to be true, that's still not gross negligence. I couldn't support a plausible claim for gross negligence. Your Honor, I think what Your Honor is describing sounds more like negligence. There is some constructive notice of a potential problem. Should additional steps be taken, that is negligence. Gross negligence requires something that smacks of intentional wrongdoing and something from which the court can infer that what Glencore intended to do was to injure plaintiffs. And that is certainly not alleged. That is certainly not alleged. That is how high the standard is. I completely disagree with you. So I'm going to go back to New York law because I'm trying to figure this out. Because it seems like a tension between the careless jargo and the 60 putback. And it seems like in 2020, with 60 putback, there was a little retrenchment on this issue of the effect of a gross negligence allegation with respect to a clause of this type. And you can call it a sole remedy clause or you can call it something else. But if you have a clear allegation of gross negligence, are you saying that under New York law, that is not enough to vitiate more or less the 70, this particular clause? That is correct, Judge. And Judge, there is no tension actually between the two decisions. Where is 60 putback? Does it say that? Because I'll tell you, I'm literally reading Kalish and understanding he talks about a sculptural agreement, but whether that makes a material difference is unclear to me. But it says no matter how flat and qualified its terms, a sculptural agreement will not exonerate a party from liability under all circumstances under announced public policy. Public policy of New York. None do that. It will not apply to exemption of lawful or grossly negligent acts. Yes, Judge. So the court of appeals takes that on directly in the 60 putback case. And there actually is no – there is no tension. So in the first case, Kalish-Jarco case, what was at issue was a contractual clause that was a nominal damages clause that limited damages to something like $350. And it was so meaningless that the court of appeals announced that you could invalidate that either by demonstrating gross negligence or intentional misconduct. And in the 60 putback case, that – the court explains that is still good law. If you were dealing with an exculpatory – a completely exculpatory clause or a nominal damages clause like the one that was at issue in the Kalish-Jarco case, you can still invalidate that via gross negligence. However, for a sole remedy clause, and assuming that the sole remedy that the parties agree to is not meaningless, it doesn't provide, you know, $2 of compensation. So it's not nominal. It's not – that's exactly right, Judge. It's not nominal. Then the public policy concerning a grossly negligent performance of a contract does not apply to invalidate that sole remedy clause. And if you're on, like, a page site that's 368 New York 3rd at 348 to 49. That's what I'm reading. Okay. And that's what you're – so really, that's what you're relying on with respect to the gross negligence issue? With respect to the contract claim, yes, Judge. But with respect to the tort claim, the plaintiffs are still required to establish that there's some independent tort duty. And there's, I mean, ample case law on this issue, again, from the Court of Appeals, including the Sommer case, that provides when your case involves the sale of a defective product, your damages are solely economic. There is no physical damage, no personal injury, no catastrophic event. Then you are bound by the deal you struck in the contract, including its allocation of risk. And that's the case that we have here. Okay. And so we've got to agree that what the 60-foot bank decision did was to resolve a tension in its prior precedent. That's the only way that I can view it. I'm not sure that it's a tension in the Court of Appeals prior precedent. I believe what happened is, following the Kyle Strzarko case, various trial courts, and perhaps even some of the department-level courts, had applied the gross negligence public policy to, for example, limits on consequential damages and other ways to allocate risk in the contracts. And what the court did in the 60-foot bank case was to clarify that the gross negligence aspect of that public policy does not apply, at least with respect to sole remedy clauses. Thank you. Thank you, Judge. We'll hear rebuttals. Mr. Barnes, before you trace it down, Mr. Bickey, any questions? Yes. No, I'm fine. Thank you. Thank you. Thank you. Thank you, Judge. Just to be clear, the 50-foot bank issue was not raised in the Court below. But even addressing it now, it does not apply when gross negligence, for instance, is its own separate tort cause of action, nor does it apply to cases of willful misconduct. I thought your whole argument is that your breach of contract claim is salvaged for damages above $300,000 because gross negligence is an exception. You're not saying that now? I'm saying both the gross negligence and the intentional misconduct, which occurred during that aspect. If they knew it and sold it to us knowing you're not, you have not alleged intentional willful misconduct. You've alleged gross negligence. Is that correct? I also alleged intentional misconduct. I didn't understand that. Okay. I'm sorry if I did. It wasn't clear in the complaint. I think we referred to it as intentional fraud. But if gross negligence is its own separate tort cause of action, then clearly the 50-foot bank litigation does not apply. Gross negligence has been alleged, and gross negligence can be a separate cause of action in this case. We have established that the capacity for catastrophic injury could occur here, that there are serial acts of negligence, that there's a violation of international law, which creates an independent duty, and we also have the failure to warn duty, all four of which create independent causes of action for gross negligence, in which case the 50-foot bank argument doesn't apply. The idea that the economic loss doctrine applies is also not applicable when it's cases of gross negligence. That's the Niagara-Mohawk case. Moreover, it doesn't apply when a defendant violates an independent duty. Finally, the idea that mitigation damages, that money incurred trying to mitigate against sustaining the physical injury that is required in tort claims is- Section 70 seems to squarely foreclose this mitigation argument, in part because it refers to we're not going to pay beyond the cap or exceeding the cap for any efforts to minimize damage. So what's the difference between that and mitigation? I would say- Does that refer to mitigation? Referring to the idea that only the economic loss, that economic losses are not recoverable, my point was this is effectively mitigation damages incurred to avoid physical damage is an exception to the economic loss doctrine. Do you agree that there's a difference in kind, legally, between the sole remedy provisions, and that that is 7D and the exculpatory where nominal damages falls? Yes. Yes. Your Honors, I think if you take a moment and review the amended complaint in the VL-8 case, compare those allegations with ours, you'll see there's absolutely no comparison. If you review the cases identified in the Net-2 Globe case, which lay out cases where the allegations are sufficient to take the case to trial, either defeating a Rule 12 motion or defeating a Rule 56 motion, the Sommer case, the Cleartone case, the Hanover insurance case, Judge Shin's decision in Baidu, you'll see that the allegations of negligence and intentional misconduct by Glencore in this case far exceed the allegations in any of those cases. Thank you. Thank you very much. Thank you. We'll reserve a decision. I do have one simple question for counsel about the differences between the varieties of claims that have been suggested. It seems difficult to discern the differences between them, obviously, but you know this industry very well. I'm just wondering, what is it that would be achieved by any intentional use of organic chlorides? I know this may seem to be not part of the record, but there's something that, in just listening to you, one can't help but wonder why or how these events might take place. As my esteemed colleague said, Glencore purchased some product from another source, which apparently included organic chlorides in it. Bunker fuel is made up of residual fuel. It's the bottom of the barrel. And it's mixed with whatever will make it porous enough, viscous enough, porous enough, et cetera, so that it can be burned under certain specifications. Apparently, this third party from whom they purchased it had also included in it organic chlorides. So I don't say that Glencore intentionally. Why would one do that is the question. Why would they do it? Why specifically judge, I don't know, other than the fact that it may have been the material they thought would cut the residual oil. In other contexts, it's just trying to expand the supply and increase the supply. Is that why you would do that? Some of it is also done not just to increase the supply, but also to improve its viscosity, to thin it out. Okay, because bunker fuel is like chocolate pudding. And to meet the specifications. Chocolate pudding sounds so good. Yeah, exactly. In terms of it's got the viscosity of chocolate pudding. And people cut it so that it makes it less viscous, makes it more pourable to fit the parameters of the specifications. Sometimes some people use things that aren't supposed to be in there to do this cutting. Have I answered that, Judge? More or less. Well, with that, thank you very much. Thank you.